UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY SERRATO,

       Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.
_____/

Civil Action No. 11-11612

HON. VICTORIA A. ROBERTS
U.S. District Judge
HON. R. STEVEN WHALEN
U.S. Magistrate Judge

## REPORT AND RECOMMENDATION

Plaintiff Timothy Serrato brings this action under 42 U.S.C. §405(g) challenging a

final decision of Defendant Commissioner denying his application for Disability Insurance

Benefits (DIB) under the Social Security Act. Both parties have filed summary judgment

motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C.

§ 636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for

Summary Judgment [Doc. #17] be GRANTED, and that Plaintiff's Motion for Summary

Judgment [Doc. #11] be DENIED.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on August 31, 2006, alleging disability beginning on June

1, 2002 (Tr. 18, 105). After the initial denial, Plaintiff requested an administrative hearing,

held on May 4, 2009 in Lansing, Michigan before Administrative Law Judge (ALJ) Larry

Meuwissen (Tr. 28). Plaintiff, represented by Carl Bender, testified (Tr. 33-48), as did Vocational Expert Mr. Reedle (Tr. 49-51). On July 1, 2009, ALJ Meuwissen found that Plaintiff was not disabled on or before his date last insured of December 31, 2008 (Tr. 26). On February 15, 2011, the Appeals Council denied review (Tr. 4-6). Plaintiff filed for judicial review of the final decision on April 14, 2011.

## BACKGROUND FACTS

Plaintiff, born August 13, 1960, was 49 on his date last insured of December 31, 2008 (Tr. 69). He completed 12th grade and received training as a robotic engineer (Tr. 133). He worked previously as a press operator and in robotic maintenance (Tr. 128). He alleges disability as a result of epicondylitis ("tennis elbow") and carpal tunnel syndrome ("CTS") (Tr. 127).

### A.    Plaintiff's Testimony

Plaintiff, 5' 9" and 195 pounds, testified that he had just recently divorced (Tr. 33). He stated that his two minor children were currently in his wife's custody (Tr. 33). Contrary to the information on his application, Plaintiff denied graduating from high school or receiving a GED (Tr. 34). He stated that he received robotics training approximately 12 years earlier (Tr. 34).

Plaintiff stated that he previously worked as a forge press operator and maintenance man until sustaining a workplace injury (Tr. 34). He testified that after receiving a Workers' Compensation settlement of $32,000, he attempted work as a sorter at Goodwill, but was forced to quit after experiencing arm swelling (Tr. 35). He stated that two elbow surgeries

and one hand surgery provided only temporary relief (Tr. 36). He alleged constant pain (Tr. 36). He added that right elbow pain caused sleep disturbances (Tr. 38). He stated that he used ointments, heating pads, and elevation for pain relief (Tr. 38, 43, 45-46). He stated over-the-counter arthritis medicine upset his stomach, noting that he did not have health insurance (Tr. 39). He stated that health problems prevented him from engaging in his former hobbies of bowling and softball (Tr. 39). He stated further that he was now experiencing left elbow pain (Tr. 40). On a scale of 1 to 10, he described his right arm pain as a "7" to "8" and his left arm pain as a "five" or "six," adding that thumb cramping created problems gripping (Tr. 41).

Plaintiff alleges that he was unable to write for more than five minutes before experiencing hand cramping (Tr. 42). He stated that while working at Goodwill, hand swelling prevented him from performing his assigned duty of sorting items and that elbow popping precluded his second assignment as a box assembler (Tr. 43-44). He estimated that he could lift a maximum of 20 pounds with his left arm on an occasional basis and was able to walk for up to a mile (Tr. 44, 47). Plaintiff also alleged concentrational problems as a result of sleep disturbances (Tr. 44). He opined that his lack of focus precluded all gainful employment (Tr. 45). Plaintiff's attorney closed his client's testimony by amending the alleged onset of disability date to January 27, 2003 (Tr. 48).

## B.    Medical Evidence

### 1. Treating Sources[1]

In July, 2002, Plaintiff felt his right elbow "pop" while lifting a two-gallon bucket (Tr. 196, 648, 1008). Treating physician Jeffrey A. Stickney, D.O. performed an examination in August, 2002 (Tr. 197, 649). Plaintiff was placed on light work duty (Tr. 647, 879). Rebecca G. Petschke, D.O. issued a work excuse for the afternoon of August 20, 2002 (Tr. 295, 717). Physical therapy intake notes state that Plaintiff reported "significant loss of right grip strength" but only minimal loss of range of motion in the elbow and wrist (Tr. 200). Also in August, 2002, Plaintiff stated that he experienced some improvement after undergoing ultrasound and massage treatment (Tr. 211, 621, 979). The same month, an EMG of the right arm was unremarkable (Tr. 210).

September, 2002 occupational therapy discharge notes state that Plaintiff experienced only a slight improvement after 12 sessions (Tr. 213, 620, 978). In October, 2002, Andrew Gutow, M.D. observed that Plaintiff had "full active and passive flexion and extension of the elbow with full pronation and supination" (Tr. 268). Dr. Gutow found that Plaintiff could resume "light duty" work (Tr. 269, 634, 721, 992). He recommended continued elbow bracing (Tr. 269). In December, 2002, Plaintiff was limited to lifting five pounds (on the right) as a result of epicondylitis and ulnar neuritis of the upper right extremity (Tr. 243, 661).

January, 2003, treating notes by surgeon David A. Levin, M.D. state that symptoms

---

[1]Treating records predating Plaintiff's alleged onset of disability have been fully reviewed but are discussed here only to the extent they are relevant to the present claim.

of epicondylitis were eased by the use of a right arm cast (Tr. 252). Dr. Gutow noted that Plaintiff's arm problems were created by repetitive movements of the elbow required by his job (Tr. 249). He signed a "proof of disability" form on Plaintiff's behalf (Tr. 292, 742, 744). Although Plaintiff had been moved to a different job classification ("yard gang"), Dr. Stickney stated that the job functions of sweeping and mopping should "be segregated into smaller intervals" (Tr. 240). In February, 2003, Plaintiff experienced right arm swelling (Tr. 259, 674, 681, 696, 702). He reported difficulty gripping and only temporary relief from recent steroid injections (Tr. 239, 256-257, 710, 1068). In March, 2003, an MRI of the right elbow showed lateral epicondylitis involving "only the common extensor tendon" (Tr. 264, 715, 1073). Michael G. Sperl, M.D. advised Plaintiff to limit his work to left hand dominant activities (Tr. 753). In April, 2003, Dr. Michael Diment noted that a recent EMG showed "some very mild Carpal Tunnel Syndrome" (Tr. 301, 748, 759). Dr. Diment opined that Plaintiff should undergo epicondylar release surgery (Tr. 301). The following month, Dr. Sperl, reviewing older treating records, noted that Plaintiff had injured his elbow at work in September, 1995 but had declined medical advice to undergo physical therapy (Tr. 750, 1097, 1107, 1112).

On June 19, 2003, Plaintiff underwent right elbow lateral epicondylar release performed by Dr. Diment (Tr. 319, 454). In August, 2003, Dr. Diment found that Plaintiff continued to experience elbow soreness and only fair grip strength, but a full range of elbow motion (Tr. 302, 760). Dr. Diment found that Plaintiff's employer was unable to find "light duty" work (Tr. 302, 316). The following month, Plaintiff reported only limited

improvement after undergoing physical therapy (Tr. 304, 315, 762). In November, 2003, Dr. Diment noted that Plaintiff had not complied with directions to take Prednisone because his health insurance had been terminated (Tr. 305, 314). The following month, Plaintiff expressed a desire to return to work (Tr. 312).

In February, 2004, Plaintiff expressed frustration that he was not able to go back to work (Tr. 311). He demonstrated "pretty good" grip strength (Tr. 311). In March, 2004, Dr. Diment found that Plaintiff could return to work with the following restrictions: "no gripping, pushing or pulling over [five pounds] repetitiously with right upper extremity. May lift normally with left upper extremity" (Tr. 299). Plaintiff was deemed able to write (Tr. 299). In April, 2004, Dr. Diment encouraged Plaintiff to continue strengthening exercises, noting that "[h]e is certainly capable of working within his restrictions currently" (Tr. 310). In May, 2004, Dr. Diment found the absence of "a good explanation" for Plaintiff's continued pain, referring him to a pain management specialist (Tr. 309, 754). In July, 2004 Raymond C. Noellert, M.D. found that Plaintiff would benefit from a carpal tunnel release (Tr. 789, 799, 864, 1153). He found that Plaintiff would be able to resume work with restrictions on November 1, 2004 (Tr. 801, 874).

In February, 2005, Plaintiff underwent right carpal tunnel release and epicondylar debridement with decompression of the posterior interosseous nerve and reattachment of the the lateral collateral ligament, performed by Dr. Noellert (Tr. 324, 332-333, 339-344, 353, 374-375, 815, 824-825, 833-834, 1155). The following month, Plaintiff stated that his elbow pain was a "2" out of 10 at best and a "6" at worst (Tr. 406). Dr. Noellert observed

that Plaintiff had healed well (Tr. 795, 868). The following month, physical therapy notes state that Plaintiff experienced a 50 percent improvement in symptoms (Tr. 409). Plaintiff showed signs of having worked outside but stated that he was "doing hardly anything because the doctor told me to do nothing" with his arm (Tr. 409). The following month, occupational therapist Deena Covey found that Plaintiff's responses to a pain evaluation suggested "symptom magnification" (Tr. 413). In June, 2005, Covey again observed that Plaintiff magnified his pain responses (Tr. 420). Treating notes from the following month state that Plaintiff was progressing satisfactorily (Tr. 773). Dr. Noellert found that Plaintiff could presently work with restrictions and resume his usual work duties on September 15, 2005 (Tr. 774, 846-847). In August, 2005, Plaintiff reported an 80 to 90 percent improvement in his symptoms since beginning treatment (Tr. 424).

A September, 2005 functional capacity assessment found that Plaintiff could perform medium to heavy work and was employable[2] (Tr. 426). Plaintiff demonstrated limitations in the upper right extremity in flexion, extension, and abduction, exhibiting only 4/5 grip strength (Tr. 427). He demonstrated a mild antalgic gait due to a recent leg injury (Tr. 427). Plaintiff did not experience significant limitations in either walking or postural activities (Tr.

---

[2]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

428-430). Plaintiff was observed to put forth maximum effort in the evaluation (Tr. 432). He was deemed able to resume work (Tr. 771, 844). He was discharged from occupational therapy the same month (Tr. 433). Dr. Noellert found that Plaintiff could lift up to 40 pounds occasionally and 20 pounds frequently (Tr. 772, 1141). In December, 2005, Dr. Noellert acknowledged the recent functional capacity findings but noted Plaintiff had since fallen on his right elbow (Tr. 768, 770, 841, 843, 1140). Dr. Noellert found that Plaintiff was capable of lifting up to 35 pounds (Tr. 768).

In April, 2006, Plaintiff reported increasing elbow pain and finger numbness (Tr. 769, 842). Dr. Noellert found that Plaintiff's symptoms of ulnar neuritis were worsening (Tr. 1139). In July, 2006, Dr. Noellert found that Plaintiff was currently unable to return to his former job (Tr. 765). He observed that Plaintiff's blood sugar was under good control (Tr. 765). He found that Plaintiff would be able to return to work on March 1, 2007 (Tr. 767, 840). He imposed a lifting restriction of no more than five pounds, no power tools, or activities requiring repetitive gripping or pinching (Tr. 767, 1137). In September, 2006, Plaintiff reported that he re-injured his right arm lifting a gallon of milk (Tr. 836, 1136). The following month, Plaintiff reported elbow pain radiating into his fingers (Tr. 1224).

In January, 2007, Dr. Noellert opined that Plaintiff's right elbow and wrist problems were attributable to work-related injuries but that arthritis of the thumb was not (Tr. 1177, 1181). In June, 2007, Dr. Noellert stated that thumb problems were a matter of "pain control," but that elbow problems "may lead to long term disability" (Tr. 1180).

In March, 2009, Dr. Noellert examined Plaintiff (Tr. 1206-1207). Plaintiff reported

cramping and tenderness of the right upper extremity (Tr. 1206). Dr. Noellert also completed a Residual Functional Capacity Questionnaire, giving Plaintiff a "poor" prognosis as a result of constant arm pain and anxiety (Tr. 1200-1201). Dr. Noellert found Plaintiff incapable of sitting or standing for more than one hour in an eight-hour workday, but was capable of sitting for six hours (Tr. 1201-1202). He found further that Plaintiff needed to walk five minutes each hour and required a sit/stand "at will" option (Tr. 1202). He found that Plaintiff was capable of lifting less than 10 pounds on a rare basis (Tr. 1202). Plaintiff was limited to occasional twisting, stooping, and crouching (Tr. 1203). Dr. Noellert stated that his evaluation applied to the period from August, 2006 to the date of the assessment (Tr. 1203).

### 2. Consultive and Non-Examining Sources

A September, 2004 letter written in regard to Plaintiff's claim for Workers' Compensation by Bala Prasad, M.D. states that EMG and nerve conduction studies performed the same month were unremarkable (Tr. 802, 804, 1216, 1218). Dr. Prasad found that Plaintiff was not a good candidate for surgery (Tr. 803). Based on a July, 2004 examination, Dr. Prasad found that Plaintiff should be limited to work limited to five to ten pound lifting (on the right) and a preclusion on the use of vibratory or high-torque equipment; and "any repetitive pronation/supination activities" (Tr. 809, 1214). Dr. Prasad found no upper extremity limitations on the left (Tr. 809).

In November, 2006, Dinesh Tanna, M.D. performed a non-examining Residual Functional Capacity Assessment on behalf of the SSA (Tr. 1162-1169). He found that

Plaintiff could lift 20 pounds occasionally and 10 frequently; sit, stand, or walk for six hours in an eight-hour workday; and push and pull without limitation in the lower extremities (Tr. 1164). Plaintiff was limited to occasional pushing and pulling in the right upper extremity (Tr. 1164-1165). His postural limitations consisted of frequent balancing, stooping, kneeling, crouching, and stair and ramp climbing; occasional crawling; and a preclusion on all climbing of ropes, scaffolds, and ladders (Tr. 1165). He was limited to frequent reaching, and occasional handling and fingering with the right upper extremity (Tr. 1166). The Assessment found the absence of manipulative limitations on the left side (Tr. 1166). The Assessment also found the absence of visual or communicative limitations (Tr. 1166-1167). Plaintiff's environmental limitations consisted of avoiding concentrated exposure to vibration (Tr. 1167).

In December, 2006 Richard Singer, M.D. performed a consultive examination of Plaintiff (Tr. 1225-1228). Dr. Singer opined that Plaintiff experienced carpometacarpal synovitis, but characterized the condition as "low level" (Tr. 1228). Dr. Singer recommended that Plaintiff avoid work requiring the elbow in "complete extension with the palm down" (Tr. 1228).

In May, 2008, Allan G. Clague, M.D. opined that repetitive use of the right upper extremity would "only cause further pathological changes" (Tr. 1187). He found that pain and upper extremity limitations prevented all gainful employment, giving Plaintiff a "poor" diagnosis (Tr. 1187, 1192).

In February, 2009, Dr. Clague completed a medical questionnaire, stating that Plaintiff

experienced significant right upper extremity pain (Tr. 1192). Dr. Clague acknowledged that

his contact with Plaintiff was limited to a neurological consultation only (Tr. 1192). He

found that Plaintiff's limitations could be expected to last 12 months (Tr. 1192). He found

that Plaintiff experienced symptoms of upper extremity problems "constantly" and was

unable to perform even low stress jobs (Tr. 1194). He found that Plaintiff was unable walk,

stand, or sit for more than two hours in an eight-hour day and would be required to walk for

10 minutes each half hour (Tr. 1195). Dr. Clague also found that Plaintiff would require a

sit/stand "at will" option (Tr. 1195). He found that Plaintiff was unable to lift even 10

pounds but did not require the use of a cane (Tr. 1195). Plaintiff was limited to "rare"

twisting, stooping, and crouching (Tr. 1196). Dr. Clague found that Plaintiff was unable to

perform any manipulative functions with the right hand (Tr. 1196).

### C. Vocational Testimony

VE Reedle classified Plaintiff's past relevant work as a press operator as exertionally

light and work as a robotic maintenance worker as heavy (Tr. 49). The ALJ posed the

following question to the VE, taking into account Plaintiff's age, education, and work

experience:

> I'd like you to assume such a person with a residual functional capacity for
> light work, occasional crawling, other all posturals would be frequent. Rule
> out no more than occasional, probably no reaching at all, no overhead reaching
> at all with the right upper extremity, occasional handling and fingering with
> the right upper extremity, no limits on the left. He was originally right hand
> dominant, but he's adapted. Avoid vibration, vibrating tools, and there's no
> limits in terms of time on feet, standing, walking. Would there be other jobs

in the regional or national economy that such a person could perform?

The VE testified that the above-described individual could perform the light unskilled work of a security guard or a gate guard (10,000 positions in the regional economy); cashier (5,000); and inspector (4,000)[3] (Tr. 50). The VE stated that his testimony was consistent with the information found in the Dictionary of Occupational Titles ("DOT"), Bureau of Labor Statistics, and his own professional experience (Tr. 51). In response to Plaintiff's counsel, the VE stated that if Plaintiff's testimony were fully credited, he would be unable to perform any full-time work (Tr. 51).

## D.     The ALJ's Decision

ALJ Meuwissen found that through the date last insured of December 31, 2008, Plaintiff experienced the severe impairments of "right lateral epicondylitis, right carpal tunnel syndrome, right cubital tunnel syndrome, right rotator cuff syndrome, and right basilar thumb arthritis, but that none of the conditions met or medically equaled one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4 (Tr. 20). He found that Plaintiff retained the residual functional capacity ("RFC") for light work with the following limitations: "only occasional crawling, no overhead reaching with the right upper extremity, only occasional handling and fingering with the right hand, and no use of vibrating tools with the right hand" (Tr. 21). Citing the VE's job findings, the ALJ found that Plaintiff could perform the work of a security guard/gate guard, cashier, and inspector (Tr. 25).

---

[3]Although not stated by the VE, these number presumably refer to job positions existing in the regional, rather than national economy (Tr. 50).

ALJ Meuwissen found Dr. Noellert's March, 2009 assessment "extremely excessive in light of [the] minimal objective medical findings . . ." (Tr. 23). Despite allegations of physical and concentrational problems, the ALJ noted that Plaintiff could prepare meals, vacuum, mow the lawn, shop, socialize, play games, and watch movies (Tr. 24).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### The Treating Physician Analysis

Plaintiff argues that the analysis of Dr. Noellert's March, 2009 disability contains multiple errors. *Plaintiff's Brief* at 10-14. He contends first that the finding that he could perform light work stands at odds with both Dr. Noellert's March, 2009 disability opinion and Dr. Noellert's July, 2006 finding that Plaintiff was unable to lift more than five pounds with his right arm. *Id.* at 10 (citing Tr. 767). Second, he contends that the ALJ's citation

to Dr. Noellert's August and October, 2006 records for the proposition that Plaintiff was not disabled amounts to a distortion of the record. *Id.* at 11-12. Plaintiff also argues that in rejecting the March, 2009 assessment, the ALJ erred by failing to acknowledge the "nature and extent" of Dr. Noellert's treating relationship as required by *Hensley v. Astrue,* 573 F. 3d 263, 266 (6th Cir. 2009). *Plaintiff's Brief* at 12-13. Finally, he faults the ALJ for rejecting Dr. Noellert's March, 2009 opinion on the basis of the sporadic treating history, but "ironically," adopting the assessment of a non-examining source (Dr. Tanna) over the treating physician opinion. *Plaintiff's Brief* at 13-14.

## 1. Applicable Law

"If the opinion of the claimant's treating physician is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley, supra,* 573 F. 3d at 266 (6th Cir. 2009)(internal quotation marks omitted)(citing *Wilson,* 378 F.3d 541, 544 (6th Circuit 2004; 20 C.F.R. § 404.1527(d)(2)). However, in the presence of contradicting substantial evidence, the ALJ may reject all or a portion of the treating source's findings, *see Warner v. Commissioner of Social Sec.,* 375 F.3d 387, 391 -392 (6th Cir. 2004), provided that s/he supplies "good reasons" for doing so. *Wilson,* at 547; 20 C.F.R. § 404.1527(d)(2). In explaining reasons for rejecting the treating physician opinion, the ALJ must consider "the length of the ... relationship and the frequency of examination, the nature and extent of the treatment ... [the] supportability of the opinion, consistency ...

with the record as a whole, and the specialization of the treating source." *Wilson,* at 544.

## 2. The Treating Physician Analysis Does Not Provide a Basis For Remand

Plaintiff argues first that the ALJ erred by finding that Dr. Noellert's earlier treating records did not support the March, 2009 "disability" opinion. *Plaintiff's Brief* at 10 (citing Tr. 767). Plaintiff asserts that the March, 2009 opinion that he was capable of lifting less than 10 pounds on a rare basis is consistent with the July, 2006 finding that he was incapable of lifting more than five pounds (Tr. 767, 1202).

Contrary to this argument, the ALJ's rejection of Dr. Noellert's March, 2009 assessment is well supported and explained. In the narrow sense, Plaintiff is correct that July, 2006 treating notes stating that he should be limited to lifting five pounds do not directly contradict the March, 2009 assessment (Tr. 767). However, in contrast to the March, 2009 finding that Plaintiff was unable to lift 10 pounds, Dr. Noellert's earlier treating notes impose a five-pound limit on *right-sided* lifting but make no mention of left-sided problems (Tr. 767). Further, while Dr. Noellert's July, 2006 treating notes state only that Plaintiff was unable to return to his former job, this is inconsistent with the March, 2009 assessment stating that Plaintiff was incapable of *all* work. (Tr. 767).

The ALJ was also entitled to reject Plaintiff's contention that he developed disabling left side problems subsequent to the 2006 assessment. Dr. Noellert's March, 2009 examination notes state only that Plaintiff was "beginning to develop elbow pain on the left side as well," but that he did not exhibit neurological deficits of the left hand (Tr. 1206).

While Dr. Noellert also noted "moderate irritability of the ulnar nerve," the left arm remarks appear to rely wholly on Plaintiff's subjective complaints (Tr. 1206-1207, 1224). Plaintiff's allegations of significant left arm complaints are not well supported by the medical record as a whole. While a December, 2006 consultive examiner allowed for the possibility of a left arm condition, he characterized the condition as "low level" (Tr. 1228). Dr. Noellert's June, 2007 exam notes, devoted entirely to Plaintiff's right-side problems, contain no mention of left arm limitations (Tr. 1180). Thus, the ALJ's rejection of Dr. Noellert's March, 2009 opinion on the basis that the medically documented impairments were limited to the right upper extremity is well supported by the record (Tr. 24).

The ALJ also provided record support for his rejection of Dr. Noellert's other findings. I agree with the statement that Dr. Noellert's March, 2009 assessment is "extremely execessive in light of . . . minimal objective findings" (Tr. 23). The record contains scant, if any, evidence supporting Dr. Noellert's finding that Plaintiff was incapable of walking or standing for more than one hour in an eight-hour workday (Tr. 1201-1202). After having read over 1,000 pages of medical records pertaining almost exclusively to right upper extremity problems,[4] I find absolutely no basis for Dr. Noellert's walking and standing limitations. *See Warner, supra*, 375 F.3d at 391 (upholding the rejection of treating physician's conclusions as to the claimant's "walking and standing abilities" where no evidence supported lower extremity impairments or how limitations as a result of carpal

---

[4]The medical transcript, while of staggering length, contains hundreds of pages of duplicative records.

tunnel syndrome affected the lower extremities).   Likewise, the treating records (even Dr. Noellert's own March, 2009 treating notes) do not support the finding that Plaintiff required an at will sit/stand option (Tr. 1202).

Plaintiff's overlapping argument that the administrative discussion of August and October, 2006 treating records "cherry-picked" favorable statements but ignored the ones supporting disability is also unavailing.   The ALJ wrote that "examinations in August 2006 and October 2006 showed impingement of the right shoulder, but good range of motion and strength" (Tr. 23).  This summation does not amount to a distortion of the treating records which I also read to state that while aspects of Plaintiff's functioning had worsened in the past few months, he exhibited a good range of motion and relatively good strength (Tr. 1136, 1224).   It is worth repeating that these treating records do not support or even mention Dr. Noellert's later "finding" that Plaintiff was unable to stand or walk for more than one hour each workday (Tr.1136, 1224).

Plaintiff's contention that the ALJ did not consider the nature and extent of the treating relationship is similarly without merit.  While the administrative opinion did not mention Dr. Noellert (or any other treating or non-treating source) by name, the ALJ noted that Plaintiff underwent surgery in February, 2005 (Tr. 22) and received followup examinations throughout 2005 and 2006 (Tr. 22-23).  Despite the relative frequency of examinations in 2005 and 2006, the ALJ permissibly observed that thereafter Plaintiff "sought follow-up with [Dr. Noellert] on only two occasions, in June 2007 and March,

2009"[5] (Tr. 23).  Finally, although Plaintiff disputes the ALJ's adoption of the findings of Dr.

Tanna, a non-examining source, over Dr. Nollert's opinion, the ALJ permissibly noted that

Dr. Tanna's findings were supported by Plaintiff's admitted daily activities, including driving

his children to school, cooking, vacuuming, yard work, and shopping as well as a reasonable

interpretation of the treating records (Tr. 24).  *See Warner, supra,* 375 F.3d at 391 (Plaintiff's

daily activities permissibly used to discount more the stringent limitations found by a treating

source).

In closing, it should be noted that the recommendation to uphold the Commissioner's

decision is not intended to trivialize Plaintiff's legitimate impairments or his well

documented inability to perform his former job.    Nonetheless, I do not find error, reversible

or otherwise, in the analysis and rejection of Dr. Noellert's disability opinion.   Moreover,

based on a review of this record as a whole, the ALJ's decision is well within the "zone of

choice" accorded to the fact-finder at the administrative hearing level, *Mullen v. Bowen*,

*supra*, and should not be disturbed by this Court.

---

[5]

Plaintiff also argues that the ALJ did not consider that  financial problems, rather than lack of symptomatology, explained the failure to seek regular treatment.   To be sure, a claimant's inability to afford medical care can be used to dispute the inference that he did not seek treatment because he was not disabled. *See* SSR 96-7p.  However, as part of the treating physician analysis, the ALJ's observation that Dr. Noellert did not treat Plaintiff on a regular basis was permissibly used to discount the physician's opinion.   The ALJ was entitled to accord lesser weight to March, 2009 opinion on the basis that at the time of assessment, Dr. Noellert saw Plaintiff on a sporadic, rather than regular basis. 20 C.F.R. § 404.1527(d)(2).  As to the contention that he could not afford regular treatment, the ALJ noted that Plaintiff received only limited treatment even after receiving a Workers' Compensation award (Tr. 24).

## CONCLUSION

For the reasons stated above, I recommend that Plaintiff's Motion for Summary Judgment [Doc. #11] be DENIED and that Defendant's Motion for Summary Judgment [Doc. #17] be GRANTED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Date:  April 6, 2012

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail disclosed on the Notice of Electronic Filing on April 6, 2012.

s/Johnetta M. Curry-Williams
Case Manager